IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**ROBERT HINMAN and ITALIA FOODS,**      )
**INC.,** individually and as the      )
representative of a class of      )
similarly-situated persons,      )
      )
            Plaintiffs,      )
      )
      v.      )      No. 06 C 1156
      )
**M and M RENTAL CENTER, INC.,**      )
      )
            Defendant.      )

<u>**MEMORANDUM OPINION AND ORDER**</u>

Robert Hinman and Italia Foods, Inc., represent a class of

individuals in an action against M and M Rental Center, Inc., in

which plaintiffs claim that M and M violated the Telephone Consumer

Protection Act ("TCPA"), 47 U.S.C. §227, by sending them one or

more unsolicited advertisements by fax.  The plaintiff class, as

defined in my order of April 7, 2008, *Hinman v. M and M Rental*

*Center, Inc.*, 545 F.Supp.2d 802, 808 (N.D. Ill. 2008), is composed

of:

> All persons who, on or after four years prior to the filing of
> this action, were sent, without permission, telephone facsimile
> messages of material advertising the commercial availability of any
> property, goods, or services by or on behalf of defendant.

Now before me are the parties' cross-motions for summary

judgment.  For the reasons discussed below, both motions are

granted in part and denied in part.

Unless otherwise noted, the following facts are undisputed.[1] Defendant is a corporation that provides goods and services for special events. In August of 1997, defendant's president, Michael Berk, bought a marketing leads list (the "Leads List") from Corporate Marketing, Inc., ("CMI") for the purpose of exposing the companies on the list to defendant and defendant's products and services.

## A. The Leads List

The Leads List contains certain contact information, including a company name, a contact name, and a fax number, for roughly 5000 companies, including the named plaintiffs.[2] CMI had selected these companies for inclusion on the Leads List because the companies

---

[1]Each of the parties has objected to numerous aspects of the other's Local Rule 56.1 filings, such as the admissibility of the cited evidence and the responsiveness of the responses. In fact, neither party has fully respected the mandate of L.R. 56.1, which requires concise statements setting forth, and responding to, the facts asserted with specific references to the record. Legal memoranda--not L.R. 56.1 filings--are the proper platforms for the parties' legal arguments (such as relevance) and citations to case law, *Portis v. City of Chicago*, 510 F.Supp.2d 461, 463 (N.D. Ill., 2008). In any event, I have carefully considered the record, and, except where otherwise noted, this account reflects my findings as to which material facts are genuinely in dispute, based on the evidence properly before me.

[2]Plaintiff Hinman was the owner of Eclipse Manufacturing, Co., one of the businesses on the list. Hinman's standing to bring this suit has been addressed in a previous ruling. *Eclipse Mfg. Co. v. M and M Rental Center, Inc.*, 521 F.Supp.2d 739, 744-45)

were likely to spend more than $5000 a year on corporate parties, meetings, and banquets.

CMI compiled the Leads List using information it obtained from various sources over the course of several years. CMI's policy was to contact every company on the lists it sold to verify company information. CMI employed compilers to call each company on a particular list to verify (or obtain) the company's contact information, including its fax number. If a company contacted by a CMI compiler refused to confirm (or provide) a fax number, CMI's policy was to remove that company from the list. Kevin Taylor, CMI's president, stated in his deposition that if a company contact asked a CMI compiler why CMI was collecting the company's fax number, the compiler would respond, "We're a database company, for fax marketing purposes, we want to send you information about goods and services."[3] Taylor estimates that twenty-five to thirty-five percent of the people called by CMI compilers asked why CMI was collecting fax numbers.

---

[3]Plaintiffs object that this testimony lacks foundation. Having reviewed the deposition transcript, I am inclined to agree, as the quoted testimony reflects only what Taylor's own response was in such instances, on the fewer than 50 calls he personally made to test the script he'd written for compilers to use. As discussed further below, however, even assuming that all compilers gave the same answer in response to questions about why CMI collected fax numbers, no reasonable jury could conclude that defendant had plaintiffs' express invitation or permission to send the faxes at issue.

CMI obtained some of the information on the Leads List from Dun and Bradstreet ("D&B"), which itself collected corporate information through various means. Specifically, D&B conducted phone interviews, purchased company information from third party data compilers, and collected information that companies voluntarily submitted either on D&B's website or in response to D&B mail surveys. John Nicodemo, a D&B employee familiar with D&B's data collections process, stated that if a "business subject" contacted by phone asked why company information was being sought, the D&B interviewer would answer that D&B was updating their files. If the business subject pressed the D&B interviewer for further information, the interviewer "would respond typically with a response that said a business has made an inquiry about you with regard to perhaps insurance or financial need." Nicodemo also stated that, "The response would be that we are trying to make our profile on your business as complete as possible for other businesses that may want to do business with you."

At least as of June 23, 2005, the Leads List included the company names, fax numbers and contact names (Robert T. Hinman and Phil Carabetta, respectively) of Eclipse Manufacturing, Co., and Italia Foods, Inc.

### B. The Fax Blasts

Approximately four years after purchasing the Leads List, defendant used the services of Xpedite Systems ("Xpedite," now a

division of Premier Global Services), a fax broadcaster, to send "fax blasts" to the companies on the Leads List. On five occasions between June of 2002 and June of 2006, defendant used Xpedite to send five faxes (hereinafter, "Fax #1," "Fax #2," etc., and collectively, the "Five Faxes") to the fax numbers on the Leads List. The parties have been able to obtain some information, in varying degrees of completeness, about the Five Faxes, based primarily on Xpedite's business records. These records have allowed the parties to piece together certain information about the Five Faxes, as discussed in more detail below. In addition, defendant produced samples of various flyers it created, some of which were or may have been sent by fax. Naturally, the parties dispute the significance of the available information.

To broadcast faxes using Xpedite, an Xpedite client uploads to Xpedite's system one or more lists containing fax numbers. The client then selects among the uploaded lists, which can be saved on the system for multiple uses, to identify the desired recipients of a particular fax. A "directory of lists" for each client reflects the different lists that that client has uploaded and indicates when each list was last modified. As of September of 2006, the Leads List appeared in the defendant's directory of lists with a last modification date of June 23, 2005.

Each time Xpedite is used to blast a recipient list, the system automatically generates and tracks certain information. For

example, the system tracks the transmission and delivery status of each message initiated. Xpedite then uses this information to create a delivery report for each blast (or "job"). The delivery reports can be either summary or detailed, depending on the client's request for the particular job.

A summary delivery report identifies the recipient list used for the job and provides information about the total number of faxes requested, the number of faxes "sent," the number of "errors," and the number of "cancelled" faxes. Summary reports do not contain an itemized account of which fax numbers correspond to "sent" faxes and which correspond to "errors" or "cancelled" faxes. Accordingly, it is not possible to identify, based on an Xpedite summary report, the individual fax numbers to which a particular transmission was "sent."

By contrast, a detailed report identifies each number called and shows the disposition of each fax for which transmission was requested. Specifically, a detailed report shows each number on a particular list and indicates whether the transmission initiated to that number was "sent," or, alternatively, whether the line was busy, there was no answer, or the transmission failed for some other reason.

The Xpedite system stores the delivery report, along with other information relating to each job, for a few days, then rolls the information off onto magnetic tapes. Thereafter, the Xpedite

job retrieval system is inconsistent. Some tapes are kept and archived, while others are recycled or reused. If information relating to a particular job was rolled off onto a tape that was archived and that can later be identified, it is possible, using the job number, to recover the delivery report for that job, as well as the content of the message transmitted (i.e., a copy of the fax). If the job was rolled off onto a tape that was recycled or reused, however, the information that was stored on the tape is irretrievably lost.

Xpedite's billing records also provide some information about each job billed to a particular client. Xpedite client invoices indicate how many faxes were sent on behalf of the client in a given billing cycle, broken down by job. Invoices indicate, for each job billed, which list was used and the total "number sent."[4]

The records in this case indicate that defendant used Xpedite to broadcast Fax #1 to the Leads List on June 24, 2002, and that the fax was "sent" to 4,469 fax numbers. No detailed report was generated for this job, and Xpedite could not retrieve information to establish the contents of Fax #1. In fact, the record does not contain a copy of Fax #1 from any source. Accordingly, the evidence establishes the total number of times Fax #1 was sent, but

---

[4]Some additional information is also provided, but none that is relevant here.

it does not establish either the contents of the fax or the individual numbers on the Leads List to which the fax was sent.

Defendant used Xpedite to broadcast Fax #2 to the Leads List on September 15, 2003, and that fax was "sent" to 4,288 fax numbers. No detailed report was generated for this job, and Xpedite could not retrieve information to establish the contents of Fax #2. The record does not otherwise contain a copy of the fax. As with Fax #1, the evidence establishes the total number of times Fax #2 was sent, but it does not establish either the contents of the fax or the individual numbers on the Leads List to which the fax was sent.

Defendant used Xpedite to broadcast Fax #3 to the Leads List on November 5, 2003, and that fax was "sent" to 4,174 fax numbers. No detailed report was generated for this job, Xpedite could not retrieve information that would show the contents of Fax #3, and the record does not otherwise contain a copy of the fax itself. Again, the evidence establishes the total number of times Fax #3 was sent, but it does not establish either the contents of the fax or the individual numbers on the Leads List to which the fax was sent.

Defendant used Xpedite to broadcast Fax #4 to the Leads List on October 29, 2004. A detailed delivery report exists for this job and shows that the fax was "sent" to 3,944 identified fax numbers, including numbers attributed to "Eclipse Mfg. Co." and

"Italia Foods Inc."  Xpedite was able to recover a copy of Fax #4 from its archives.

Fax #4 is a one-page flyer that begins with the text, "Thanksgiving is just 27 days away! and the holidays are right around the corner!"  That text is followed by, "Let M&M help plan and produce all of your Holiday parties and special events," then these bullet points: "Corporate Meetings," "Product Introductions," "Team Building," "Employee/Customer Entertaining," "Trade Shows." In the center of the page is a text box containing information on an "Industry Open House," including the date and time of the event, and the invitation to "Enjoy an evening of Hors d'oerves (sic) & Cocktails while exploring all our new rental offerings and services! Reserve your spot today!"  The bottom portion of the flyer, outside the text box, reads, "We deliver all you (sic) event needs, our professionals will set up everything and take everything down with a minimum of intrusion on your daily life.  Our talented team of over 100 event professionals have decades of experience and will work seamlessly with you to make your events spectacular successes."  Finally, the flyer invites the reader to "visit our website...to learn more about our offerings and services."

Defendant used Xpedite to broadcast Fax #5 to the Leads List on June 23, 2005.  No detailed delivery report was generated for this job.  Xpedite was able to recover a copy of Fax #5, however, and the named plaintiffs attached as exhibits to their second

amended complaint the copies of Fax #5 that each received. Information stamped on the face of the copies attached as exhibits includes the date June 23, 2005, the companies' respective fax numbers, and the names Robert T. Hinman and Phil Carabetta, respectively. The fax numbers and contact names on these copies correspond to the information attributed to Eclipse and Italia on the Leads List. Defendant does not dispute that Fax #5 is an advertisement.

## II.

### A. Legal Standards

The Seventh Circuit has often described summary judgment as the "put up or shut up" moment in a lawsuit. *AA Sales & Associates, Inc., v. Coni-Seal, Inc.*, ---F.3d.---, 2008 WL 5134643, at *6 (7th Cir. 2008) (*citing Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). In the present cross-motions and responses, each party "must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson*, at 901 (citation omitted). As the movant, each party must demonstrate that undisputed facts properly in the record entitle it to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp., v. Catrett*, 477 U.S. 317, 322 (1986). As the non-movant, each party must set forth specific to contravert those asserted by the movant, demonstrating a triable dispute. Fed. R. Civ. P. 56(e). To withstand summary judgment, the non-movant must show

10

that there is sufficient evidence for a jury to find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In evaluating the parties' cross-motions, I must draw all reasonable inferences from the undisputed facts in the non-movant's favor, and I must view any disputed facts in the light most favorable to the non-movant. *Harney v. Speedway SuperAmerica*, LLC, 526 F.3d 1099, 1104 (7th Cir. 2008). Only disputes that may affect the outcome of the suit in light of the substantive law will preclude summary judgment. *Id.*

The TCPA prohibits any person from using "any telephone facsimile machine, computer or other device to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. §227(b)(1)(c).[5] The statute defines "telephone facsimile machine" as:

> equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

47 U.S.C. §227(a)(3). The Federal Communications Commission ("FCC") has clarified that "personal computers equipped with, or attached to, modems and to computerized fax servers" fall within this definition, and that faxes sent to such equipment are subject

---

[5]The parties do not argue that the exceptions provided for in the statute are applicable here.

11

to the statute's prohibitions. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order adopted June 26, 2003, and released July 3, 2003, at ¶ 200, 18 FCC Rcd. 14014, 14133 (2003)("FCC Order").

The TCPA defines "unsolicited advertisement" as:

material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise.

47 U.S.C. §227(a)(5).

The standard that I previously outlined in this case, *see Eclipse Mfg. Co. v. M and M Rental Center, Inc.*, 521 F.Supp.2d 739, 745 (N.D.Ill. 2007), may thus be fleshed out as follows: to prevail under the TCPA, plaintiffs must show that (1) defendant used a telephone facsimile machine, computer or other device to send one or more faxes to plaintiffs' facsimile machines; (2) the faxes sent contained material advertising the commercial availability or quality of any property, goods, or services, and (3) plaintiffs did not give prior express invitation or permission for defendant to send the faxes.

## B. The Five Fax Blasts

Defendant plainly used a "telephone facsimile machine, computer or other device to send" many thousands of faxes, and the evidence that the Five Faxes were sent a total of 20,756 times to businesses on the Leads List cannot seriously be disputed.

12

Defendant's discussion of "false positives"--fax transmissions that appear to have been completed successfully, but that were not in fact delivered--falls far short of raising a triable issue of fact.

First of all, defendant's "false positives" discussion is entirely hypothetical with respect to the transmissions at issue. Defendant has introduced no evidence that any of the faxes Xpedite's system registered as "sent" did not actually reach its destination. To stave off summary judgment on the ground that this is a genuinely disputed fact, defendant would have to raise more than "some metaphysical doubt" as to whether the faxes were sent. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Defendant has not done so. Speculation about paper jams, power failures, server crashes, and similar potential sources of error is insufficient.

Setting aside the insufficiency of its evidence, however, defendant's argument is flawed in a more fundamental respect. Defendant focuses on the purported lack of evidence that the Five Faxes were *received* by the plaintiffs, but the statutory scheme of the TCPA clearly focuses on the *sending* of unsolicited advertisements. According to defendants, plaintiffs can only prevail under the TCPA if they can prove not only that the Five Faxes were sent, but also that they were received and even printed. This construction of the statute, however, imports elements that neither Congress, nor the FCC, nor any soundly reasoned authority

has stated are part of a TCPA claim.[6]  Defendant asserts that plaintiffs cannot establish that defendants sent the Five Faxes because they cannot prove that plaintiffs received and printed them.

I need not address the factual underpinnings defendant asserts for this argument because the argument itself fundamentally misconstrues the TCPA's prohibition on unsolicited faxes.  On its face, the statute prohibit the *sending* of unsolicited fax advertisements and make no reference at all to receipt, much less to printing.  "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. v. South Coast Air Quality Management Dist.*, 541 U.S. 246, 252 (2004) *(quoting Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)).  While it is true, as defendant argues, that Congress expressed concern about fax blasters shifting material costs such as paper and toner to the recipients of unwanted "junk" faxes, Congress elected to define the proscribed activity with reference to sending, not to receipt or printing, and the legislative history does not support reading these additional, unstated elements into a TCPA claim.

_____

[6]To the extent the reasoning of a handful of state court cases implies that receipt or printing may be required under the TCPA, I disagree with their construction of the statute, as noted below.

Moreover, as noted above, the FCC has specifically rejected the argument defendant makes here, that faxes received by networked fax machines (which allow recipients to view and discard unwanted faxes prior to printing them) are beyond the reach of the statute. *FCC Order*, at ¶ 200; *see also Holtzman v. Caplice*, No. 07 C 7279, 2008 WL 2168762, at *7 (N.D. Ill., May 23, 2008)(Manning, J.)(faxes received by "fax programs on a computer" subject to TCPA). To the extent the authorities defendant cites (Illinois, Pennsylvania, and New Jersey state court cases) support its argument, they are inconsistent with the text of the statute and the FCC Order and are unpersuasive.

In sum, even if defendant had presented concrete evidence of "false positives" such as those it describes, it could not avoid summary judgment based on that evidence. In light of the statute's focus and the uncontroverted documentary evidence that 20,756 faxes were sent to numbers on the Leads List, defendant cannot avoid summary judgment on the basis that the Five Faxes were not sent.

### C. Consent

Defendant next contends that none of the Five Faxes violates the TCPA because the companies on the Leads List gave defendant prior express invitation or permission to send them fax advertisements when they provided or verified their fax numbers to a CMI compiler or a D&B data collector. Defendant states that the CMI and D&B callers who obtained or verified the fax numbers on the

15

Leads List would, if probed, advise company representatives that the information obtained could be sold to other companies and used for fax marketing. Defendant further notes that CMI's practice was to delete from its lists any company that refused to provide or verify the company's fax number. From these undisputed facts, defendant concludes that each of the companies on the Leads List consented to receiving the Five Faxes.

Defendant sets the stage for its argument by asserting that the word "permission" as used in the TCPA should be construed broadly, as contrasted with the preceding terms "express invitation." Defendant posits that Congress's use of the disjunctive "or" in the phrase "express invitation or permission" was intended to convey two distinct concepts: a narrow, specific type of consent ("express invitation"), and a general, permanent, and unrestricted type of consent ("permission"). Defendant then argues that the companies on the Leads List gave defendant general permission to send them any material whatsoever by fax when they provided or verified their fax numbers to CMI and/or D&B.

This argument is unavailing for numerous reasons. At the outset, I am not at all persuaded by defendant's conclusory assertion that the word "permission," as commonly used, implies a broader concept than "invitation."[7] Moreover, the FCC appears to

_____

[7]Defendant cites no authority for this assertion, and it is not supported by my brief review of definitions provided in commonly cited dictionaries of the English language.

reject defendant's contention and to interpret the TCPA as requiring "express permission" as well as "express invitation." *See FCC Order*, at ¶ 191, 18 FCC Rcd 14014, 14128 ("Congress determined that companies that wish to fax unsolicited advertisements to customers must obtain their *express permission* to do so before transmitting any faxes to them," *citing* 47 U.S.C. §§ 227(b)(1)(c) and (a)(4)(emphasis added)).  Ultimately, however, whether Congress intended the adjective "express" to modify one or both of the nouns in the disjunctive phrase "invitation or permission" is a question that can be left for another day, since the record fails to establish that defendants had any meaningful permission at all to send plaintiffs advertisements by fax.

Defendants rely primarily on the deposition testimony of Kevin Taylor of CMI, and of John Nicodemo of D&B, to support their theory of consent.  But the testimony of these witnesses does not establish that any of the plaintiffs gave meaningful (i.e., knowing) consent to receive defendant's advertisements.  Mr. Taylor testified that company representatives of an estimated one-quarter to one-third of the companies CMI called inquired about the reason they were being asked for their fax numbers.  Even assuming that in each such case, the CMI compiler responded, as Mr. Taylor testified he himself did in the relevant portion of the fewer than fifty calls he personally made, "We're a database company, for fax marketing purposes, *we want to send you information* about goods and

services" (emphasis added), or, "So *we* can periodically, for fax marketing purposes, periodically send you information about goods and services" (emphasis added), this testimony does not establish that defendant had plaintiffs' consent to send the Five Faxes. Far from advising companies that their fax numbers would be sold to third parties for marketing purposes, these responses appear instead to mislead company contacts into believing that CMI itself wished to send information by fax.

Moreover, as plaintiffs correctly observe, Mr. Taylor did not testify that any company on the Leads List, after hearing the CMI compiler's response, agreed to provide or to verify its fax number for the stated purpose. As to the two-thirds to three-quarters of company representatives who did not ask CMI callers why their fax numbers were being verified, because the TCPA allocates the burden of obtaining consent on the senders of unsolicited faxes, rather than requiring recipients to "opt-out," *Holtzman*, 2008 WL 2168762, at *6, *citing Italia Foods, Inc v. Marinov Enterprises, Inc.*, No. 07 C 2494, 2007 WL 4117626, at *3, it would be error to assume that by simply providing the information CMI compilers requested, these companies had impliedly consented to receive any and all faxes from any entity whatsoever.[8]

---

[8]In addition, it is not clear whether or how CMI attempted to establish that the company representative it spoke to had authority to grant the consent it claims it obtained. I need not address this point further, however, because I find that no valid consent was given, regardless of who would be bound if it were.

For his part, John Nicodemo of D&B did not quantify how often company representatives contacted to provide information asked what the information would be used for, but he testified that D&B data collectors would respond to such questions, "typically with a response that said a business has made an inquiry about you with regard to perhaps insurance or financial need." Nicodemo also stated that, "The response would be that we are trying to make our profile on your business as complete as possible for other businesses that may want to do business with you." Although these responses did indicate to company representatives that the information they provided would in turn be provided to third parties, they too are misleading. These responses imply that D&B's information gathering was in response to individualized business inquiries, rather than for the purpose of compiling lists that any company willing to puchase the lists could use to fax blast advertisements.

Moreover, Mr. Nicodemo also testified, "The one thing I'd like to make clear is that the fax number was not a priority. What was more important was the identity and demographic information. If they happened to have collected the fax number during the course of the investigation, we would collect it." According to Mr. Nicodemo, the focus of D&B data gatherers' calls was on obtaining information other than fax numbers. In this light, it would be particularly unreasonable to assume that company representatives

who provided various types of company information did so with the understanding that they thereby granted consent for unidentified third parties to send them fax advertisements.

Frankly, the most striking aspect of the responses described by both Mr. Taylor and Mr. Nicodemo is their careful avoidance of any language that would clearly convey to companies that the fax numbers they provided would in turn be provided to third parties such as defendant, who sought to broadcast advertisements by fax. "Express permission to receive a faxed ad requires that the consumer understand that by providing a fax number, he or she is agreeing to receive faxed advertisements." *FCC Order*, ¶ 193, 18 FCC Rcd 14014, at 14129. I conclude that no reasonable trier of fact could find, consistently with the law, that plaintiffs consented to receiving the Five Faxes based on the testimony of Messrs. Taylor and Nicodemo.

Furthermore, the evidence that plaintiffs published or otherwise distributed their fax numbers to particular recipients, such as clients and vendors, in the course of conducting their business does not amount to consent. As the FCC has explained,

> fax numbers are published and distributed for a variety of reasons, all of which are usually connected to the fax machine owner's business or other personal and private interests...they are not distributed for other companies' advertising purposes. Thus, a company wishing to fax ads to consumers whose numbers are listed in a trade publication or directory must first obtain the express permission of those consumers.

*Id.* As this excerpt demonstrates, defendant's argument that plaintiffs gave defendant permission to send the Five Faxes when they listed, distributed, or published their fax numbers without affirmatively restricting the use of those numbers to non-advertising purposes is inconsistent with the TCPA.

Defendant's cited cases do not support their consent theory. The case that comes closest to the facts presented here is *Travel 100 Group, Inc., v. Mediterranean Shipping Co.*, 383 Ill.App.3d 149, 889 N.E. 2d 781 (Ill.App.Ct. 2008). In that case, the Illinois Appellate Court held that the plaintiff's inclusion of its contact information in a trade association directory, coupled with the plaintiff's various signed statements authorizing release of that information, amounted to consent. Here, of course, there is no evidence that plaintiffs gave written consent; and as noted above, the FCC has made clear that distrubution of fax numbers for business purposes does not amount to consent. Defendant's remaining citations in support of their consent argument likewise miss the mark.

In sum, I find that no reasonable jury could conclude that defendant had plaintiffs' "express invitation or permission" to send the Five Faxes, and defendant cannot avoid summary judgment on that basis.

### D. Advertisements

The parties' final disagreement is whether any or all of the Five Faxes are advertisements.  As noted above, only the content of Faxes #4 and #5 can be ascertained with certainty.  Nevertheless, plaintiffs submit that the only rational conclusion supported by the evidence is that all of the Five Faxes were advertisements. Defendant does not dispute that Fax #5 is an advertisement, but argues that Fax #4 is not an advertisement, and claims that plaintiffs have not proven and cannot prove that Faxes #1-#3 were advertisements.

Defendant concedes that Fax #5 is an advertisement, so I need not linger on the point.  Fax #4 similarly requires little discussion because it clearly is an advertisement, notwithstanding defendant's protestations to the contrary.  Defendant's characterization of Fax #4 as merely an invitation to an industry open house simply ignores large portions of the fax.  As noted above, although the fax contains a text box in the center that can reasonably be construed as an invitation, the prominent text above and below the box plainly advertises the commercial availability and quality of defendant's services.

As to the remaining faxes, although I disagree with defendant's assertion that there is "no evidence" that Faxes #1-#3 were advertisements, I agree that plaintiffs cannot ultimately prevail on their claim without direct evidence of the contents of

those faxes.  The circumstantial evidence plaintiffs cite--Michael Berk's purpose in purchasing the Leads List; copies of fliers that defendant created, but that cannot be linked to any particular fax transmission; and records showing that some fax was sent to the Leads List on the dates corresponding to Faxes #1-#3--do indeed tend to support the conclusion that Faxes #1-#3 were advertisements, but this evidence is too attenuated to carry plaintiffs' burden.

None of the advertising flyers in the record, except those that reliable evidence demonstrates correspond to Faxes #4 and #5, can reasonably be linked to Faxes #1, #2, or #3.  I am aware of no case (nor do plaintiffs cite any) in which a plaintiff has prevailed under the TCPA where it cannot produce a copy of the allegedly offending advertisement.  While Congress's clear intent was to prohibit unsolicited advertising, it is equally clear that Congress intended non-commercial messages to fall outside the ban. *See Phillips Randolph Enterprises, LLC v. Adler-Weiner Research Chicago, Inc.*, 526 F.Supp.2d 851, 852 (N.D. Ill. 2007).  For example, "industry news articles" and other messages that are primarily informational are not prohibited. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 and the Junk Fax Prevention Act of 2005*, 2006 WL 901720, 21 F.C.C.R. 3787, at 3814 (April 6, 2006).  Moreover, "an incidental advertisement contained in a newsletter does not convert the entire

communication into an advertisement." *Id*. What this indicates is that the determination of whether a fax constitutes an advertisement under the TCPA requires the type of nuanced analysis that cannot be undertaken in the abstract. Plaintiffs' evidence as to the contents of Faxes #1, #2, and #3, while relevant, is nevertheless insufficient to prove their claim under the TCPA.

### III.

For the foregoing reasons, I conclude that plaintiffs are entitled to judgment as to Faxes #4 and #5, and their motion for summary judgment is granted to that extent. I also conclude that defendants are entitled to summary judgment as to Faxes #1-#3, and their motion for summary judgment is granted to that extent. The remainder of both motions is denied. The plaintiff class is entitled to statutory damages in the amount of $3,862,500, based on the total of 7,725 unsolicited advertisements that defendants sent in Faxes #4 and #5.

ENTER ORDER:

_____

**Elaine E. Bucklo**
United States District Judge

Dated:   January 27,2009

24